**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com

**THE SIMON LAW FIRM, P.C.**
Anthony G. Simon (*Pro Hac Vice*)
Jeremiah W. Nixon (*Pro Hac Vice*)
800 Market Street, Suite 1700
St. Louis, Missouri 63101
Telephone: (314) 241-2929
Facsimile: (314) 241-2029
E-Mail: asimon@simonlawpc.com
jnixon@simonlawpc.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES FOX, PETER SAMISH, CHRISTOPHER BARULICH, INDIA PRICE, and CHELSEA MARQUEZ individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE, LLC,<br><br>Defendant. | Case No. 3:23-cv-5437-RFL<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>Hon. Rita F. Lin |

James Fox, Peter Samish, Christopher Barulich ("Home Depot Plaintiffs"), India Price ("Discover Plaintiff"), and Chelsea Marquez ("Uber Plaintiff") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF ACTION

1. Defendant Google, LLC ("Defendant" or "Google") has developed and provides a customer service product called Google Cloud Contact Center AI (hereafter "GCCCAI") as a software-as-a-service.

2. GCCCAI is employed by numerous entities, including Home Depot U.S.A., Inc. ("Home Depot"), Discover Financial Services[1] ("Discover"), and Uber Technologies, Inc. ("Uber") (collectively, the "Non-Defendant Entities") to monitor voice interactions on customer service phone lines.

3. Home Depot, Discover, and Uber contracted with Google and its GCCCAI service to respond to customers who call from California and across the nation to, among other things, receive support through these channels ("Contact Centers").

4. By virtue of providing the GCCCAI service, however, Defendant also records, accesses, reads, and learns the contents of conversations between Californians and customer service representatives. And, crucially, neither Defendant nor the Non-Defendant Entities procure the prior consent, express or otherwise, of any person who interacts with the Non-Defendant Entities' customer service agents, prior to Defendant recording, accessing, reading, and learning the contents of conversations between Californians and the Non-Defendant Entities' customer service representatives.

[1] Discover Financial Services was recently acquired by Capital One Financial Corporation. Discover still operates under its brand name. The complaint applies only to Discover Contact Centers.

5. Through its use of GCCCAI, Defendant has failed to comply with the California Invasion of Privacy Act ("CIPA") §§ 631 and 632.

6. Plaintiffs bring this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant having recorded, accessed, read, and learned the contents of communications between Californians and the Non-Defendant Entities without procuring prior consent, in contravention of CIPA §§ 631 and 632.

**THE PARTIES**

7. Plaintiff James Fox resides in Folsom, California and has an intent to remain there, and is therefore a citizen of California. Mr. Fox, an account holder with Home Depot, was in California when he spoke to a representative from Home Depot over the phone on September 15, 2023.

8. Plaintiff Peter Samish resides in Sylmar, California and has an intent to remain there, and is therefore a citizen of California. Mr. Samish, an account holder with Home Depot, was in California when he spoke to a representative from Home Depot over the phone on March 23, 2023.

9. Plaintiff Christopher Barulich resides in Los Angeles, California and has an intent to remain there, and is therefore a citizen of California. Mr. Barulich was in California when he spoke to a representative from Home Depot over the phone on multiple occasions.

10. Plaintiff India Price resides in San Diego, California and has an intent to remain there, and is therefore a citizen of California. Ms. Price, an account holder with Discover, was in California when she spoke to a representative from Discover over the phone from her home in or about September 2025.

11. Plaintiff Chelsea Marquez resides in Sacramento, California and has an intent to remain there, and is therefore a citizen of California. Ms. Marquez, an account holder with Uber, was in California when she spoke to a representative from Uber over the phone from her home in or about September 2025.

12. Defendant Google LLC ("Google" or "Defendant") is a Delaware limited liability company, with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California, 94043. Google does business throughout California and the entirety of the United States. Google provides a customer contact and support solution called "Google Cloud Contact Center AI," which is at issue here and described more fully below.

13. At all relevant times, Home Depot, Discover, and Uber contracted with Google to use its GCCCAI service.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

15. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in California.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL BACKGROUND

### I. THE CALIFORNIA INVASION OF PRIVACY ACT

17. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

18. As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been

> recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

19. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from (i) "intentionally tap[ping], or mak[ing] any unauthorized connection ... with any telegraph or telephone wire," (ii) "willfully and without the consent of all parties to the communication ... read[ing], or attempt[ing] to read, or to learn the contents or meaning of any ... communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or (iii) "us[ing], or attempt[ing] to use ... any information so obtained." CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping.

20. In addition, as part of CIPA, the California Legislature enacted § 632 to provide further protection for confidential communications. To establish liability under Cal. Penal Code § 632, a plaintiff needs to show that the defendant:

> [I]ntentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

21. Individuals may bring an action against the violator of CIPA §§ 631 or 632 for injunctive relief and $5,000 per violation. Cal. Penal Code § 637.2.

## II. DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT §§ 631(A) AND 632

22. GCCCAI is a "human-like generative AI powered contact center" that, among other things, "empowers human agents with continuous support during their calls and chats by

identifying intent and providing real-time, step-by-step assistance" and "uses natural language processing to identify call drivers and sentiment that helps contact center managers learn about customer interactions to improve call outcomes."[2]

23. When a consumer calls into a GCCCAI-powered contact center, they may first be presented with a virtual agent provided by Google. Virtual agents are not identified as being provided by Google, and so consumers reasonably believe the virtual agent is provided by the company they are calling.

24. Regardless, if a consumer requests to speak with a human agent, the virtual agent transfers the consumer – along with a transcript of the conversation up until that point – to a human agent[3]:




25. Crucially, once a consumer is routed from the virtual agent to the human agent, they expect the conversation is only between themselves and the human customer service agent.

[2] CONTACT CENTER AI, https://cloud.google.com/solutions/contact-center.
[3] HOW DOES GOOGLE CLOUD CONTACT CENTER AI WORK?, https://youtu.be/i8b4pEYIsIM?si=NjkXMwHwCJXOIKyz&t=158.

They do not expect, nor do they have any reason to suspect, that the virtual agent or any sort of third party is listening in on the conversation. After all, that is the point of being transferred.

26. And yet, contrary to those expectations, Google is *still listening* even when a call is transferred from a virtual agent to a human agent. Specifically, a Google "session manager monitors the state of the conversation" with the human agent[4]:




27. Google, through GCCCAI, does not simply listen in on the conversation between the consumer and the human agent though. It also "[t]ranscribe[s] calls in real time for agents to reference during the call or for analysis after the call."[5]

28. In addition, Google, through GCCCAI, "grabs the context of the conversation to suggest articles and real-time, step-by-step guidance" to the agent.[6] In other words, Google,

---

[4] HOW DOES GOOGLE CLOUD CONTACT CENTER AI WORK?, https://youtu.be/i8b4pEYIsIM?si=NjkXMwHwCJXOIKyz&t=160.

[5] AGENT ASSIST, https://cloud.google.com/agent-assist?hl=en.

[6] HOW DOES GOOGLE CLOUD CONTACT CENTER AI WORK?, https://youtu.be/i8b4pEYIsIM?si=szJ4Bfl9egcT5p1N&t=174.

through GCCCAI, is actively analyzing the real-time contents of conversations between companies like the Non-Defendant Entities and their customers.




29. Further, through GCCCAI, Google provides "smart replies" to the agent based on Google's analysis of the real-time contents of the conversations[7]:




[7] HOW DOES GOOGLE CLOUD CONTACT CENTER AI WORK?, https://youtu.be/i8b4pEYIsIM?si=DTnLsP36i4vO1NLD&t=188.

30. Recently, Google integrated generative AI ("Gen AI") in its GCCCAI products to "improve[] the development process, shifting from a world of interactive voice response (IVR) and scripted chatbots to a world of intelligent steering and assistive virtual agents."[8]

31. Throughout the relevant time period, Home Depot, Discover, and Uber have contracted with Google to listen in on conversations through GCCCAI, and for Google to provide at least all of the features mentioned above.

32. In 2024, Google and Home Depot announced "an extension of their multi-year relationship" that involves "Home Depot accessing Google Cloud's AI capabilities to enhance the customer experience and optimize operations. By harnessing Google Cloud's AI innovation platform, Vertex AI, advanced model training capabilities, and advanced data analytics, The Home Depot plans to gain deeper insights into customer preferences and needs."[9]

33. Fahim Siddiqui, CIO of The Home Depot, said: "Our technology team looks forward to continuing to work closely with Google to remove friction for our customers when they shop with us and to stay on the cutting edge of retail technology."[10]

34. In a press release in April 2024, Discover announced it was collaborating with Google Cloud "to introduce generative AI technology into its customer care centers" with the "aim[] to enhance the customer and agent experience, and improve agent productivity, offering faster, more personalized, and efficient resolutions."[11]

---

[8] TRANSFORMING THE CONTACT CENTER WITH GENERATIVE AI, https://cloud.google.com/blog/topics/telecommunications/how-generative-ai-can-be-used-in-the-contact-center.

[9] HOME DEPOT TO LEVERAGE GOOGLE CLOUD'S AI CAPABILITIES TO OPTIMIZE OPERATIONS, https://www.nasdaq.com/articles/home-depot-to-leverage-google-clouds-ai-capabilities-to-optimize-operations.

[10] *Id.*

[11] DISCOVER FINANCIAL SERVICES DEPLOYS GOOGLE CLOUD'S GENERATIVE AI TO TRANSFORM CUSTOMER SERVICE, https://investorrelations.discover.com/newsroom/press-releases/press-release-details/2024/Discover-Financial-Services-Deploys-Google-Clouds-Generative-AI-to-Transform-Customer-Service/default.aspx.

35. Specifically, Discover integrated Vertex AI into its GCCCAI and/or Google platform to "empower its nearly 10,000 contact center agents with gen AI-driven tools[.]"[12] One such tool is the real-time search assistant, which uses natural language processing to allow agents to "access vast knowledge bases to suggest relevant information during live interactions, so they spend less time searching and more time helping customers."[13]

36. To do so, "Google Cloud and Discover collaborated to build gen AI into Discover's call center solutions by training and tuning Google's large language models with a set of questions frequently asked across various tenured groups of agents with their expected answers."[14]

37. Moreover, Szabolcs Paldy, Senior Vice President of Enterprise Operations at Discover, explains, "the Discover Virtual Assistant, powered by generative AI, can assist customers directly and provide additional information to Discover service agents, delivering smoother, more efficient, and more satisfying interactions to customers around the world — in whatever channel they prefer."[15]

38. As Mr. Paldy explains, "when a live customer service agent takes over a conversation from the Discover Virtual Assistant, we provide a generative AI summary of the previous conversation."[16] "We built a tool with Google that uses generative AI to not just find the right procedures, but also summarize and provide insight that the agent is looking for."[17]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] NEW WAY NOW: DISCOVER POWERS AWARD-WINNING CUSTOMER EXPERIENCES WITH GEN AI AND GOOGLE CLOUD, https://www.youtube.com/watch?v=mTElZ-V2IlA

[16] *Id.*

[17] *Id.*

39. As a result, "Live agents are now up to 70% faster at accessing the right information, have reduced the time it takes to provide their first response by 20-30%, and are around 40% faster in transferring messages related to complex conversations."[18]

40. Uber has also partnered with Google Cloud to "help[] create a stronger and more empowered Workforce."[19]

41. Specifically, according to Uber CEO Dara Khosrowshahi, Uber is "using Google Cloud's AI platform to build [their] own AI agents to help their support teams."[20]

42. In regard to Uber's "customer service representatives, the company launched new tools that summarize communications with users and can even surface context from previous interactions, so front-line staff can be more helpful and effective."[21]

43. Google profits from its provision of the GCCCAI service. For instance, Google charges its clients "$0.03 per minute" for "Agent Assist for voice sessions with Summarization and other assist features."[22]

44. When GCCCAI is used on a telephone conversation, it is not like a tape recorder, or a "tool" used by one party to record the other. Instead, GCCCAI involves Google – a separate and distinct third-party entity from the parties to the conversation – using GCCCAI to eavesdrop upon and record a conversation to which it is not a party. This is so because Google itself is collecting the contents of any conversation, as alleged above. Google also needs access to the data

---

[18] *Id.*

[19] GOOGLE CLOUD, YOUTUBE, https://www.youtube.com/watch?v=T4DHSJyy08Y.

[20] *Id.*

[21] AI IS HERE, AI IS EVERYWHERE: TOP COMPANIES, GOVERNMENTS, RESEARCHERS, AND STARTUPS ARE ALREADY ENHANCING THEIR WORK WITH GOOGLE'S AI SOLUTIONS, https://cloud.google.com/transform/101-real-world-generative-ai-use-cases-from-industry-leaders.

[22] AGENT ASSIST PRICING, https://cloud.google.com/agent-assist/pricing.

in order to service customers like Home Depot, Discover, and Uber such as through providing recommendations, analyzing customer intent, and transcribing conversations in real time.

45. Google has the capability to use the contents of conversations it collects through GCCCAI. For instance, in its "Service Specific Terms," Google has a section pertaining to "AI/MIL Services," which includes GCCCAI.[23] In this section, Google states it can use "Customer Data" to "train or fine-tune any AI/ML models" with its clients' permission (but not the end user's permission).[24] Thus, Google has the capability to use the wiretapped data it collects through GCCCAI to improve its AI/ML models (i.e., to improve the AI-based products and services Google provides).

46. During consumers' calls to the Contact Centers, Google fails to inform consumers, prior to any recording: (i) that Google, a third party, is listening in on consumers' communications, (ii) that Google, a third party, is tapping or otherwise making an unauthorized connection with the consumer's telephone conversation using GCCCAI, and (iii) that the content of consumers' confidential communications with the Contact Centers are being recorded, collected, intercepted, and analyzed by Google, a third party, using GCCCAI.

47. The GCCCAI service was designed to record and analyze real-time phone conversations. As such, when Google provided the GCCCAI service to the Non-Defendant Entities, Google understood and therefore intended to record the communications of customers who called into the Contact Centers.

48. At times, Google listens to, records, and monitors conversations that take place during customer calls to the Contact Centers regardless of whether these conversations take place inside the customer's residence, workplace, or place of business.

49. Therefore, Defendant's conduct violates the rights of Californians set forth in CIPA §§ 631 and 632.

---

[23] SERVICE SPECIFIC TERMS, https://cloud.google.com/terms/service-terms.

[24] *Id.*

## III. PLAINTIFFS' EXPERIENCES

### A. Plaintiff Fox

50. Plaintiff Fox called Home Depot's Contact Center numerous times, including on September 15, 2023 while at his home in California.

51. In these conversations, Plaintiff Fox reasonably expected his conversations with Home Depot to be only between himself and Home Depot.

52. During these calls with Home Depot, Plaintiff Fox first interacted with a "virtual agent." Plaintiff Fox was not aware, nor did he have any reason to suspect, that the virtual agent was being provided by a third party, Google, rather than Home Depot.

53. On these calls, Plaintiff Fox then asked to be transferred from the virtual agent to a human agent. When Plaintiff Fox's call was transferred to the human agent, he reasonably expected the conversation would be only between himself and the Home Depot human customer service agent. He did not expect or have any reason to expect that the virtual agent, let alone a virtual agent provided by Google, a third party, was listening in on his conversation.

54. Nonetheless, Google, through GCCCAI, eavesdropped on Plaintiff Fox's entire conversation with the Home Depot human customer service agent. Specifically, a Google session manager monitored the conversation between Plaintiff Fox and Home Depot, and Google, through GCCCAI, transcribed Plaintiff Fox's conversation in real time, analyzed the context of Plaintiff Fox's conversation with Home Depot, and suggested "smart replies" and news articles to the Home Depot agent Plaintiff Fox was communicating with.

55. Through the aforementioned process, Google read and learned, in real time, the contents of Plaintiff Fox's conversation with Home Depot.

56. Neither Home Depot nor Google procured Plaintiff Fox's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Fox's conversation with Home Depot. Nor did Plaintiff Fox give his prior consent, express or otherwise, to Google or Home Depot to allow Defendant to wiretap his communications with Home Depot.

57. Plaintiff Fox has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

**B. Plaintiff Samish**

58. Plaintiff Samish called Home Depot's Contact Center numerous times, including on March 23, 2023 while at his home in California.

59. In these conversations, Plaintiff Samish reasonably expected his conversations with Home Depot to be only between himself and Home Depot.

60. During these calls with Home Depot, Plaintiff Samish first interacted with a "virtual agent." Plaintiff Samish was not aware, nor did he have any reason to suspect, that the virtual agent was being provided by a third party, Google, rather than Home Depot.

61. On these calls, Plaintiff Samish then asked to be transferred from the virtual agent to a human agent. When Plaintiff Samish's call was transferred to the human agent, he reasonably expected the conversation would be only between himself and the Home Depot human customer service agent. He did not expect or have any reason to expect that the virtual agent, let alone a virtual agent provided by Google, a third party, was listening in on his conversation.

62. Nonetheless, Google, through GCCCAI, eavesdropped on Plaintiff Samish's entire conversation with the Home Depot human customer service agent. Specifically, a Google session manager monitored the conversation between Plaintiff Samish and Home Depot, and Google, through GCCCAI, transcribed Plaintiff Samish's conversation in real time, analyzed the context of Plaintiff Samish's conversation with Home Depot, and suggested "smart replies" and news articles to the Home Depot agent Plaintiff Samish was communicating with.

63. Through the aforementioned process, Google read and learned, in real time, the contents of Plaintiff Samish's conversation with Home Depot.

64. Neither Home Depot nor Google procured Plaintiff Samish's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Samish's conversation with Home Depot. Nor did Plaintiff Samish give his prior consent, express or otherwise, to Google or Home Depot to allow Defendant to wiretap his communications with Home Depot.

65. Plaintiff Samish has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

**C. Plaintiff Barulich**

66. Plaintiff Barulich called Home Depot's Contact Center numerous times, including most recently in or about October 2023 while at his home in California.

67. During these calls with Home Depot, Plaintiff Barulich first interacted with a "virtual agent." Plaintiff Barulich was not aware, nor did he have any reason to suspect, that the virtual agent was being provided by a third party, Google, rather than Home Depot.

68. On these calls, Plaintiff Barulich then asked to be transferred from the virtual agent to a human agent. When Plaintiff Barulich's call was transferred to the human agent, he reasonably expected the conversation would be only between himself and the Home Depot human customer service agent. He did not expect or have any reason to expect that the virtual agent, let alone a virtual agent provided by Google, a third party, was listening in on his conversation.

69. Nonetheless, Google, through GCCCAI, eavesdropped on Plaintiff Barulich's entire conversation with the Home Depot human customer service agent. Specifically, a Google session manager monitored the conversation between Plaintiff Barulich and Home Depot, and Google, through GCCCAI, transcribed Plaintiff Barulich's conversation in real time, analyzed the context of Plaintiff Barulich's conversation with Home Depot, and suggested "smart replies" and news articles to the Home Depot agent Plaintiff Barulich was communicating with.

70. Through the aforementioned process, Google read and learned, in real time, the contents of Plaintiff Barulich's conversation with Home Depot.

71. Neither Home Depot nor Google procured Plaintiff Barulich's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Barulich's conversation with Home Depot. Nor did Plaintiff Barulich give his prior consent, express or otherwise, to Google or Home Depot to allow Defendant to wiretap his communications with Home Depot.

72. Plaintiff Barulich has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

**D. Plaintiff Price**

73. Plaintiff Price called Discover's Contact Center in or about September 2025 and October 2025, from her home in California.

74. Plaintiff Price reasonably expected her conversations with Discover's Contact Center to be only between herself and Discover.

75. During the calls with Discover, Plaintiff Price first interacted with a "virtual agent." Plaintiff Price was not aware, nor did she have any reason to suspect, that the virtual agent was being provided by a third party, Google, rather than Discover.

76. On the calls, Plaintiff Price then asked to be transferred from the virtual agent to a human customer service agent. When Plaintiff Price's calls were transferred to the human agent, she reasonably expected the conversation would be only between herself and the Discover human customer service agent. This is due in part to the fact she discussed details regarding a loan, what she needed the loan for, and other personal details about payment for the loan, and disclosed her name and account information. She did not expect or have any reason to expect that Google, a third party, was listening in on her conversations with the Discover human customer service agent.

77. Nonetheless, Google, through GCCCAI, eavesdropped on Plaintiff Price's entire conversations with the Discover human customer service agent. Specifically, a Google session manager monitored the conversation between Plaintiff Price and Discover, and Google, through GCCCAI and its features, including Vertex AI, transcribed Plaintiff Price's conversations in real time, analyzed the context of Plaintiff Price's conversations with Discover using natural language processing, and suggested "smart replies" and news articles to the Discover agent Plaintiff Price was communicating with.

78. Through the aforementioned process, Google read and learned, in real time, the contents of Plaintiff Price's conversations with Discover.

79. Neither Discover nor Google procured Plaintiff Price's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Price's conversations with Discover. Nor did Plaintiff Price give her prior consent, express or otherwise, to Google or Discover to allow Defendant to wiretap her communications with Discover.

80. Plaintiff Price has, therefore, had her privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

**E. Plaintiff Marquez**

81. Plaintiff Marquez called Uber's Contact Center in or about September 2025, from her home in California.

82. In this conversation, Plaintiff Marquez reasonably expected her conversation with Uber to be only between herself and Uber, especially because she disclosed her name, phone number, and Uber account information.

83. During the call with Uber, Plaintiff Marquez first interacted with a "virtual agent." Plaintiff Marquez was not aware, nor did she have any reason to suspect, that the virtual agent was being provided by a third party, Google, rather than Uber.

84. On the call, Plaintiff Marquez then asked to be transferred from the virtual agent to a human customer service agent. When Plaintiff Marquez's call was transferred to the human agent, she reasonably expected the conversation would be only between herself and the Uber human customer service agent. She did not expect or have any reason to expect that the virtual agent, let alone a virtual agent provided by Google, a third party, was listening in on her conversation with the Uber human customer service agent.

85. Nonetheless, Google, through GCCCAI, eavesdropped on Plaintiff Marquez's entire conversation with the Uber human customer service agent. Specifically, a Google session manager monitored the conversation between Plaintiff Marquez and Uber, and Google, through GCCCAI and its features, transcribed Plaintiff Marquez's conversation in real time, analyzed the context of Plaintiff Marquez's conversation with Uber using natural language processing, and

suggested "smart replies" and news articles to the Uber agent Plaintiff Marquez was communicating with.

86. Through the aforementioned process, Google read and learned, in real time, the contents of Plaintiff Marquez's conversation with Uber.

87. Neither Uber nor Google procured Plaintiff Marquez's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Marquez's conversation with Uber. Nor did Plaintiff Marquez give her prior consent, express or otherwise, to Google or Uber to allow Defendant to wiretap her communications with Uber.

88. Plaintiff Marquez has, therefore, had her privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

## CLASS ALLEGATIONS

89. Plaintiffs James Fox, Peter Samish, and Christopher Barulich seek to represent a class defined as all residents of the State of California who called Home Depot customer service while in California and who had the contents of their conversations with Home Depot read and learned by Defendant using GCCCAI (the "Home Depot Class").

90. Plaintiff Price seeks to represent a class defined as all residents of the State of California who called Discover customer service while in California and who had the contents of their conversations with Discover read and learned by Defendant using GCCCAI (the "Discover Class").

91. Plaintiff Marquez seeks to represent a class defined as all residents of the State of California who called Uber customer service while in California and who had the contents of their conversations with Uber read and learned by Defendant using GCCCAI (the "Uber Class").

92. The Home Depot, Discover, and Uber Classes will collectively be referred to as the "Class."

93. The following people are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents,

successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

94. **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named Plaintiffs. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from records belonging to Defendant, Home Depot, Discover, and Uber.

95. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

(a) Whether Defendant violated CIPA § 631;

(b) Whether Defendant violated CIPA § 632;

(c) Whether Defendant sought or obtained prior consent – express or otherwise – from Plaintiffs and the Class; and

(d) Whether Plaintiffs and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

96. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class because the named Plaintiffs, like all other members of the Class, had the content of their communications read, learned, analyzed, and/or examined by Google.

97. **Adequate Representation:** Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

98. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

99. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

100. Plaintiffs bring this claim individually and on behalf of the members of the Class (Home Depot, Uber, and Discover) against Defendant.

101. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

102. To establish liability under CIPA § 631(a), Plaintiffs need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

103. GCCCAI is a "machine, instrument, contrivance, or ... other manner" used to engage in the prohibited conduct at issue here.

104. Google is a separate legal entity that offers "'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Google was a third party to any communication between Plaintiffs and members of the Class, on the one hand, and Home Depot, Discover, and Uber on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F Supp. 3d 891, 900 (N.D. Cal. 2023); *Turner v. Nuance Communications, Inc.*, 2024 WL 2750017, at *10 (N.D. Cal. May 28, 2024); *Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *6 (W.D. Wash. July 2, 2024).

105. At all relevant times, through GCCCAI, Google intentionally tapped, electrically or otherwise, the lines of telephone communication between Plaintiffs and members of Class, on the one hand, and Home Depot, Discover, and Uber on the other hand.

106. At all relevant times, through GCCCAI, Google willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of the Plaintiffs and members of Class, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

107. Plaintiffs and members of the Class did not consent to any of Defendant's actions discussed above. Nor have Plaintiffs or members of Class consented to Defendant's intentional access, interception, reading, learning, recording, collection, and analysis of communications with Home Depot, Discover, and Uber.

108. The violation of CIPA § 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

109. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by the violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Google's violations of CIPA § 631(a).

## COUNT II
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632(a)**

110. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

111. Plaintiff Price brings this claim individually and on behalf of the members of the Discover Class against Defendant.

112. CIPA § 632(a) prohibits and entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the

> presence of one another or by means of a telegraph, telephone, or other device, except a radio.

113. GCCCAI and its features is an "electronic amplifying or recording device."

114. At all relevant times, the communications between Plaintiff Price and putative Class Members, on the one hand, and Discover customer service agents, on the other, were confidential. Discover is a bank and therefore all callers have a reasonable expectation of privacy when calling their bank, as they discuss financial matters.

115. At all relevant times, Google intentionally used GCCCAI and its features, including Vertex AI, to eavesdrop upon and record the confidential communications of Plaintiff Price and members of the Discover Class, on the one hand, and Discover customer service agents, on the other.

116. When communicating with Discover, Plaintiff Price and members of the Discover Class had an objectively reasonable expectation of privacy. Plaintiff Price and members of the Discover Class did not reasonably expect that anyone other than Discover customer service agents would be on the other end of the chat, and that other, third-party entities like Google, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff Price and members of the Discover Class. Indeed, Plaintiff Price and members of the Discover Class each communicated confidential financial information to Discover customer service agents, which enhances their reasonable expectation of privacy because such sensitive communications should not be disclosed to or intercepted by third parties like Google.

117. Plaintiff Price and members of the Discover Class did not consent to any of Google's actions. Nor have Plaintiff Price and members of the Discover Class consented to Google's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff Price and members of the Discover Class.

118. The violation of CIPA § 632(a) constitutes an invasion of privacy sufficient to confer Article III standing.

119. Pursuant to Cal. Penal Code § 637.2, Plaintiff Price and members of the Discover Class have been injured by the violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Fed. R. Civ. P. 23, naming Plaintiffs as the representative of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For statutory damages of $5,000 for each violation of CIPA § 631(a);

(e) For statutory damages of $5,000 for each violation of CIPA § 632(a);

(f) For pre- and post-judgment interest on all amounts awarded;

(g) For an order of restitution and all other forms of equitable monetary relief; and

(h) For an order awarding Plaintiffs and the Class their reasonable attorney's fees and expenses and costs of suit.

**JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 19, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Neal J. Deckant</u>*

Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com

**THE SIMON LAW FIRM, P.C.**
Anthony G. Simon (*Pro Hac Vice*)
Jeremiah W. Nixon (*Pro Hac Vice*)
800 Market Street, Suite 1700
St. Louis, Missouri 63101
Telephone: (314) 241-2929
Facsimile: (314) 241-2029
E-Mail: asimon@simonlawpc.com
jnixon@simonlawpc.com

*Attorneys for Plaintiffs*